UNITED STATES of America

v.

DiSANTILLO, Michele Romeo, Appellant.

No. 79–1524.

United States Court of Appeals,
Third Circuit.

Argued Dec. 14, 1979.

Decided Feb. 7, 1980.

Charles Gordon (argued), Washington, D. C., for appellant; John A. Knorr, A Professional Corp., Daniel R. Gigler, Pittsburgh, Pa., on brief.

Frederick W. Thieman (argued), Asst. U. S. Atty., Robert J. Cindrich, U. S. Atty., Pittsburgh, Pa., for appellee.

Before ALDISERT, VAN DUSEN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major question presented in this appeal from sentence and conviction under 8 U.S.C. § 1326,[1] which prohibits the reentry of an alien who has been arrested and de-

---

1. 8 U.S.C. § 1326 provides:

§ 1326. Reentry of deported alien

Any alien who—

(1) has been arrested and deported or excluded and deported, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both.

ported, is whether the statute of limitations had run prior to return of the indictment. The government contends that DiSantillo was "arrested and deported" in 1962 when he was sixteen years of age and that he subsequently entered the United States as an immigrant on March 23, 1970, with a visa issued by the American Consul General in Naples, Italy. He was interviewed by agents of the Immigration and Naturalization Service in Pittsburgh, Pennsylvania in 1976, and on January 16, 1979, nearly nine years after his entry into the United States, he was indicted under § 1326 on the theory that he made misrepresentations in his visa application. After trial and conviction the district judge imposed the maximum sentence provided by law and refused to release appellant on bond pending an appeal to this court. At the time of oral argument, appellant had already served his sentence and had been released on parole. We now reverse the judgment on the ground that this prosecution was barred by the federal statute of limitations, 18 U.S.C. § 3282,[2] at least four years prior to the indictment.

## I.

Although we decide this appeal only on the statute of limitations issue, we are not completely satisfied that the government met its burden of proving its case beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 362, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970). On December 10, 1962, DiSantillo, then sixteen years of age, arrived in Baltimore, Maryland on a merchant ship on which he served as a deck boy. DiSantillo was issued a D–1 pass that allowed him to go ashore, but required his return by eight o'clock the following morning. A companion and he then left the ship, did some shopping, and proceeded to Baltimore's railroad station, purportedly to buy some aftershave lotion. While they were at the railroad station, officers of the Immigration and Naturalization Service took them into custody. The government contends that the two aliens possessed one-way tickets to New York City, had insufficient funds to purchase return tickets, and had aroused suspicion when DiSantillo claimed to be delivering shoes to his brother in New York even though he had none in his possession. DiSantillo was taken to the INS office in downtown Baltimore. Once there he was interviewed and served with Form I–99, *Notice of Revocation and Penalty*, which essentially informed appellant that he was in the United States illegally and that he was to be deported. The document was explained to DiSantillo in both English and Italian, his native language, after which he signed it.

◼ The form did not mention the word "deportation" in its title; it was merely entitled *Notice of Revocation and Penalty*. This form failed to notify DiSantillo that he had been *arrested* and deported.[3] DiSantillo was returned to the ship and the next morning INS agent Francis H. Curry boarded the vessel and served its captain with INS Form I–259, entitled *Notice to Detain, Deport, or Remove Aliens*. This

---

2. 18 U.S.C. § 3282 provides:
 Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

3. The notice provided:
 Your D–1 Conditional Landing Permit has been revoked, and your detention and deportation aboard the M/V MARIA AMELIA LOLLI GHETTI has been directed, pursuant to Section 252(b) of the Immigration and Nationality Act.
 You are hereby placed on notice that under the law a crewman whose D–1 Conditional Landing Permit is revoked, and who is then deported, cannot thereafter lawfully enter the United States, unless prior to his embarkation at a place outside the United States, the Attorney General has expressly consented to his reapplying for admission. Moreover, under the law a crewman who enters or attempts to enter the United States at any time after such deportation without having received permission from the Attorney General to reapply for admission, is guilty of a felony and, upon conviction, is liable to imprisonment of not more than two years, or a fine of not more than $1,000, or both such fine and imprisonment.

form also provided insufficient notice to DiSantillo for three reasons. First, the form was directed to the ship captain, not to DiSantillo. Second, the notice, by means of a box checked by the INS authorities, directed the captain to "Detain [DiSantillo] on Board." Another box on the form, which stated "Deport from the United States," was left blank. Finally, the reason stated on the form for the action against DiSantillo was that he was a "Malafide Crewman under Sec. 252(b) of I & N Act." [4] This statement is inaccurate because even under the government's theory, DiSantillo was a bona fide crewman; he was a deck boy on the ship. The captain should have been notified by the INS that the action was being taken, not under the "bona fide crewman" clause of § 252(b), but under the clause alleging that the crewman "does not intend to depart on the vessel . . . which brought him . . . .."

On February 14, 1963, while his ship was docked at Norfolk, Virginia, appellant duly filed Form I–212, *Application for Permission to Reapply for Admission into the United States after Deportation or Removal.* Part of the information requested on this form was whether DiSantillo had been "excluded and deported (less than one year ago)" or "arrested and deported." DiSantillo checked "excluded and deported (less than one year ago)" and asked to reenter the United States as a "visitor (Seaman)." The INS denied his request on June 6, 1963. This reapplication for admission in 1963 is important because it tends to demonstrate that DiSantillo was unaware of the classification the INS had given him.

The record fails to indicate that DiSantillo was ever formally advised that he had been "arrested" in 1962 when he was a sixteen year old youth, or that he had been advised of the formal niceties that distinguish the related concepts of "excluded and deported" and "arrested and deported." Indeed, there is a serious question whether the government proved that DiSantillo was actually "arrested."

The government contends that on February 16, 1970, when applying for an immigrant visa at Naples, Italy, DiSantillo made a false statement by answering "no" to the following question on his application (Form FS–510, printed in English and Italian):

(b) Aliens who seek re-entry within one year of their exclusion from the United States, or who have been arrested and deported from the United States, or removed at Government expense in lieu of deportation, or removed as an alien in distress or as an alien enemy; aliens who procure or attempt to procure a visa or other documentation by fraud or willful misrepresentation; aliens who are not eligible to acquire United States citizenship, or who have departed from or remained outside the United States to avoid United states military service in time of war or national emergency; aliens who have been convicted for violating or for conspiring to violate certain laws or regulations relating to narcotic drugs or marihuana, or who are known or believed to be, or to have been, an illicit trafficker in narcotic drugs or marihuana; aliens seeking entry from foreign contiguous territory or adjacent islands within two years of their arrival therein on a non-signatory carrier; [aliens] who are unable to read and understand some language or dialect; aliens who, knowingly and for gain, have encouraged or assisted any other alien to enter, or attempt to enter, the United

---

4. This provision states in part:

(b) Pursuant to regulations prescribed by the Attorney General, any immigration officer may, in his discretion, if he determines that an alien is not a bona fide crewman, or does not intend to depart on the vessel or aircraft which brought him, revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a)(1) of this section, take such crewman into custody, and require the master or command-

ing officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such vessel or aircraft, if practicable, and such crewman shall be deported from the United States at the expense of the transportation line which brought him to the United States. Until such alien is so deported, any expenses of his detention shall be borne by such transportation company. . . .

8 U.S.C. § 1282(b).

States in violation of law; and aliens who are former exchange visitors who have not fulfilled the two-year foreign residence requirement.

Do any of the foregoing classes apply to you? Yes No X (if answer is Yes, explain).

Government Exhibit 1. A visa was issued March 17, 1970, and DiSantillo was duly admitted to the United States at New York on March 23, 1970.

The trial court instructed the jury that the government had to prove three essential elements to establish a violation of 8 U.S.C. § 1326: that appellant was an alien, that he was arrested and deported in 1962, and that on February 24, 1976, he was found knowingly in the United States.[5] It seems to us that an ingredient of the government's case in a criminal prosecution under § 1326, based on the foregoing facts, was proof that DiSantillo understood the distinction between "re-entry within one year of their exclusion from the United States" and "arrested and deported from the United States" in his 1970 application for a visa. To prove this ingredient, the government had to prove that DiSantillo had knowledge of an "arrest," i. e., that he had been "arrested and deported" when he was a sixteen-year old juvenile in 1962, as distinguished from being simply deported. We need not decide this issue, however, because the criminal prosecution under § 1326 was barred by the five-year statute of limitations, 18 U.S.C. § 3282.[6]

## II.

DiSantillo argues that the statute of limitations under § 1326 began to run at the time he entered the United States on March 23, 1970, and concludes that an indictment for his illegal entry issued after March 23, 1975, is time barred. The government responds that the statute began to run at the moment DiSantillo was "found" in the United States illegally on February 24, 1976. Under the government's formulation, violation of § 1326 is a continuing offense effectively tolling the statute of limitations for as long as the alien remains illegally in the country. Thus, only if the violation of § 1326 is a continuing offense is the government's prosecution of DiSantillo within the prescribed time limit.

The district court summarily rejected DiSantillo's statute of limitations argument:

A reading of the statute makes the time of the commission of the offense whenever the defendant is found unlawfully in the United States, and the statute of limitations does not run so long as the alien is present in the United States. *United States v. Bruno,* 328 F.Supp. 815 (W.D.Mo.1971); *United States v. Alvarado-Soto,* 120 F.Supp. 848 (S.D.Cal.1954).

*United States v. DiSantillo,* Cr. No. 79-29, Slip Op. at 2 (W.D.Pa. March 9, 1979). The district court then determined that the statute of limitations did not begin to run until 1976 when appellant was "found" in the United States and interviewed by INS agents. For several reasons we conclude that the decisions relied upon by the district court do not compel the conclusion reached by that court in this case.

First, the two cited decisions are factually distinguishable. In this case DiSantillo entered the country at a United States immi-

---

**5.** Rec. at 242–43. In its instructions to the jury, the court explained:

Now, here the government claims it has shown by various exhibits . . . that in Government Exhibit 1, [DiSantillo] signed an application for a visitor's visa . . . setting forth that he was of Italian birth and that he had not been arrested or deported. There is a specific question there, you will recall, that stated, among other things, whether or not he had been arrested or deported, and the answer was no, and that by Exhibit 2 they have shown that after that application, he was in fact granted a visitor's

visa which was granted on March 17, 1970, which was to expire July 16, 1970, and I think the visitor's visa shows that he actually entered into the United States on March 23, 1970.

Rec. at 243–44.

**6.** We also do not decide whether proof of willfulness is required in a prosecution under 8 U.S.C. § 1326. *See, e. g., Pena-Cabanillas v. United States,* 394 F.2d 785, 789 (9th Cir. 1968); *United States v. Trott,* 227 F.Supp. 448, 449 (D.Md.1964).

gration service port of entry with a visa issued by the Department of State. In *United States v. Alvarado-Soto*, 120 F.Supp. 848 (S.D.Ca.1954), the alien "after having been excluded and deported from the United States was thereafter found in the United States without having obtained the permission of the Attorney General to be admitted here and without having been excused from doing so." *Id.* at 849. The opinion is unclear about how the reentry was accomplished. In *United States v. Bruno*, 328 F.Supp. 815, 821 (W.D.Md.1971), the alien was deported to Italy from the United States in 1964 and illegally reentered the United States by crossing the border from Canada to Niagara Falls, New York, in 1970. Similarly, in *United States v. Rincon-Jimenez*, 595 F.2d 1192 (9th Cir. 1979), filed after the district court decision in this case, the court in *dictum* used § 1326 as an example of a continuing offense. Rincon-Jimenez had "illegally entered the United States in August 1969 by traversing the beach between Tijuana and San Ysidro late at night." 595 F.2d at 1193. Thus, all three decisions that have previously addressed this issue involved a facially illegal entry into the United States. In contrast, DiSantillo entered the United States through an official port of entry by virtue of a visa issued by the Department of State.

Second, these previous decisions gave inadequate consideration to DiSantillo's proffered construction of the statute. The entire discussion of the statute of limitations issue in *Alvarado-Soto* is contained in the following conclusory language: "Defendant has raised the . . . statute of limitations as a bar to this prosecution. This defense is without merit. The defendant's criminal conduct continued each day that he was present in the United States. Since he was present here at the time the indictment was brought the prosecution was timely."

120 F.Supp. at 850. This example of *petitio principii*, or begging the question, hardly qualifies as a reasoned elaboration. Yet the *Bruno* court relied on it exclusively.[7] In *Rincon-Jimenez*, the court merely cited *Alvarado-Soto* and *Bruno* in noting that § 1326 is a continuing offense. 595 F.2d at 1194. Rather than committing the same error of deeming an issue finally resolved before it has received proper consideration, we must examine the statute and fully explain our legal conclusion. An analysis of the language of the reentry statute is essential because the statute at issue is not a mere deportation statute, as in *Lehmann v. United States ex rel. Carson*, 353 U.S. 685, 690, 77 S.Ct. 1022, 1024, 1 L.Ed.2d 1122 (1957), but a criminal statute the violation of which entails substantial penalties.

Inquiry into the applicability of the continuing offense analysis to a criminal statute must begin with a consideration of *Toussie v. United States*, 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). In *Toussie*, the Court held that failure to register for the draft was not a continuing offense that would extend the statute of limitations. The government had argued that every male between the ages of eighteen and twenty-six was required to register under § 3 of the Universal Military Training and Service Act, 50 U.S.C. App. § 453, and that Toussie's failure to register between those ages was a continuing violation. Under the government's reasoning, the statute of limitations would not have begun to run until Toussie's twenty-sixth birthday. The Court rejected this argument, noting that Presidential Proclamation No. 2799, 13 Fed. Reg. 4173, 62 Stat. 1531 (July 20, 1948), required registration not more than five days after the eighteenth birthday. It concluded that the offense of nonregistration was complete on the sixth day after the

---

7. Under this statute, it has been held that, under Section 1326, Title 8, United States Code, making it a crime to be found in the United States after having been excluded and deported, the criminal conduct continued and this statute of limitations did not run so long as the alien was present in the United States. *United States v. Alvarado-Soto* (S.D.Cal.) 120

F.Supp. 848. Clearly, the provisions of that statute are met by the facts which have been stipulated in the case at bar. Under the provisions of Section 1326, Title 8, United States Code, the time of the commission of the offense is when the defendant is "found" unlawfully in the United States. 328 F.Supp. at 825.

eighteenth birthday, and the statute of limitations began to run at that time. 397 U.S. at 119, 123, 90 S.Ct. at 862, 864.

■ In reaching this conclusion, the Court set forth guidelines for determining when the applicable statute of limitations begins to run.

The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity. For these reasons and others, we have stated before "the principle that criminal limitations statutes are 'to be liberally interpreted in favor of repose,' United States v. Scharton, 285 U.S. 518, 522 [, 52 S.Ct. 416, 417, 76 L.Ed. 917] (1932)." United States v. Habig, 390 U.S. 222, 227 [, 88 S.Ct. 926, 929, 19 L.Ed.2d 1055] (1968). We have also said that "[s]tatutes of limitations normally begin to run when the crime is complete." Pendergast v. United States, 317 U.S. 412, 418 [, 63 S.Ct. 268, 271, 87 L.Ed. 368] (1943); see United States v. Irvine, 98 U.S. 450, 452 [, 25 L.Ed. 193] (1879). And Congress has declared a policy that the statute of limitations should not be extended "[e]xcept as otherwise expressly provided by law." 18 U.S.C. § 3282. These principles indicate that the doctrine of continuing offenses should be applied in only limited circumstances since, as the Court of Appeals correctly observed in this case, "[t]he tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends the statute beyond its stated term." [United States v. Toussie]

410 F.2d [1156, 1158 (2d Cir. 1969)]. These considerations do not mean that a particular offense should never be construed as a continuing one. They do, however, require that such a result should not be reached unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one.

397 U.S. at 114–15, 90 S.Ct. at 860. Toussie indicates the disfavor with which the federal judiciary must regard assertions that a crime is a continuing offense by setting forth the general principle that the statute of limitations begins to run the moment the crime is complete. See also Pendergast v. United States, 317 U.S. 412, 418, 63 S.Ct. 268, 270, 87 L.Ed. 368 (1943); United States v. Sloan, 389 F.Supp. 526, 529 (S.D.N.Y. 1975). None of the decisions that have deemed § 1326 a continuing offense has examined that section under the analysis in Toussie. For the government's argument to prevail under the precepts enunciated in Toussie, it must demonstrate congressional intent to make entry or attempted entry by a previously arrested and deported alien a continuing offense. On examination of this argument, we reject it.

■ We first turn to the statute on which the criminal prosecution is based. "[A]s with any case involving the interpretation of a statute, our analysis must begin with the language of the statute itself." Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) (citations omitted); see also Bartholomew v. Northampton National Bank, 584 F.2d 1288, 1293 (3d Cir. 1978). The statute provides that the offense is complete on the occurrence of one of three circumstances: when an alien who has been arrested and deported "enters, attempts to enter, or is at any time found in, the United States." 8 U.S.C. § 1326. In discharging our responsibility "to construe the language so as to give effect to the intent of Congress," United States v. American Trucking Associations, Inc., 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) (footnote omit-

ted), we must proceed on the assumption that Congress intended a distinction among crimes committed at the separate times mentioned in the statute. The addition of "found" to the statute when it was reenacted in 1952, *see* 2 Gordon & Rosenfield, Immigration Law and Procedure § 9.25, at 9–60.2 (1979), is strong evidence that Congress intended it to differ in meaning from "enter," *see Klein v. Republic Steel Corp.*, 435 F.2d 762, 765–66 (3d Cir. 1970) (construing a Pennsylvania statute). Congress must have intended to include the crimes committed by entry or attempted entry through the regular immigration service procedures, of which the INS would have an official record, as well as the crime committed by being found in the United States when the alien did not enter the United States through an INS port of entry, thus providing the INS with no official record of his entry. Otherwise, Congress could have removed "enters" entirely and provided simply that the crime is complete whenever the alien "attempts to enter" or is "found in the United States." The only alternative would be that Congress intended "enters" to remain as mere surplusage.[8] But "[i]n construing a statute we are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *see United States v. Johnson*, 462 F.2d 423, 428 (3d Cir. 1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973). Although the legislative history is barren in this respect, *see* H.Rep.No.1365, 82d Cong., 2d Sess., *reprinted in* [1952] U.S. Code Cong. & Admin.News, pp. 1653, 1724, we are persuaded that Congress intended a distinction between surreptitious crossing of the United States border and entry at a recognized INS port of entry.

Section 1326 seeks to prevent subsequent illegal entry by aliens whose previous violations of the immigration laws have resulted in their arrest and deportation. It deters reentry by imposing substantial criminal penalties for violations. A violation occurs whenever an alien enters or attempts to enter the country, but Congress recognized that not every alien would enter through recognized ports of entry. Thus, although the act that Congress sought to prevent occurs even when the alien enters surreptitiously, immigration officials are unlikely to know about the violation at that time. Only the alien knows the precise date of his surreptitious entry. Congress must have included the word "found" in § 1326 to alleviate the difficult law enforcement burden of finding and prosecuting this class of illegal aliens, who are already aware that they are in violation of the law as evidenced by their surreptitious entry, before the five year statute of limitations runs.

In marked contrast, DiSantillo entered the United States through a recognized immigration port of entry in New York. The immigration authorities knew of his entry and could have, through the exercise of diligence typical of law enforcement authorities, discovered his violation at that time. The purpose of the statute of limitations is to balance the government's need for sufficient time to discover and investigate the crime against the defendant's right to avoid perpetual jeopardy for offenses committed in the distant past. *Toussie v. United States*, 397 U.S. at 114–15, 90 S.Ct. at 859–860. The government admits having a file on DiSantillo in Baltimore. *See* Brief for Appellee at 8 n.2. The American Consulate in Naples, Italy, processed and approved his application for a visa in 1970. Brief for Appellant at 5. The immigration authorities allowed him to en-

---

**8.** Only one situation comes to mind in which a prosecution for "entry" could not be initiated by the defendant being "found in the United States." That situation would involve a defendant who entered and then departed from this country without being apprehended. In that situation, authorities in the United States would need to have the defendant extradited back to this country. Zealous as the INS may be, we are unwilling to assume that Congress added "enters [or] attempts to enter" solely to meet the unlikely contingency that the defendant would be extradited back to the United States. More probably, Congress intended to deal with that situation, if it considered it at all, by having the United States authorities invoke the "fleeing from justice" exception to the statute of limitations in 18 U.S.C. § 3290.

ter New York later in 1970. Rec. at 28, 47. He filed a report each year with the INS giving his current address. Rec. at 185–86. The government thus had sufficient opportunities to discover DiSantillo's offense. Its failure to do so is no basis to overcome the substantial policy favoring repose,[9] or to construe § 1326 so as to render part of it superfluous.

We believe that logic and good reason support this interpretation and that it comports with the legislative intent. Moreover, it is congruent with the Supreme Court's interpretation of the limitations statute in *Toussie*. The critical event giving rise to this prosecution and making the offense complete occurred on March 23, 1970, the date he entered the United States at New York. This case does not require the appellant to defend against acts that occurred in 1976 when he was apprehended and interviewed by the INS agents in Pittsburgh; rather, it requires him to explain his 1970 visa application and his March 23, 1970 reentry into the United States at New York City. This is a clear case for application of the major purpose of the statute of repose, as stated by the Supreme Court in *Toussie* : "to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." 397 U.S. at 114–15; 90 S.Ct. at 860. This prosecution, initiated nine years after reentry and based on events that occurred seventeen years previously when the defendant was only sixteen years old, is a paradigm case for invocation of the statute of limitations.

 Our conclusion that the crime of illegal entry through a recognized INS port of entry after being arrested and deported is not a continuing offense is further supported by the Supreme Court's decision in *United States v. Cores*, 356 U.S. 405, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958). In *Cores*, the Court held that, for purposes of venue, violation of § 252(c) of the Immigration and Nationality Act, 8 U.S.C. § 1282(c), is a continuing offense for which venue will lie in whatever district the defendant is apprehended. *Id.* at 409, 78 S.Ct. at 878. In construing the statute, the Court stated:

> Section 252(c) punishes "[a]ny alien crewman who willfully remains in the United States in excess of the number of days allowed." The conduct proscribed is the affirmative act of willfully remaining, and the crucial word "remains" permits no connotation other than continuing presence. Nor does the section necessarily pertain to any particular locality, such as the place of entry, for the Act broadly extends to willfully remaining "in the United States."

*Id.* at 408, 78 S.Ct. at 878 (footnote omitted). But the Court was careful to distinguish §§ 275 and 276, 8 U.S.C. §§ 1325, 1326, noting that

> [t]hose offenses are not continuing ones, as "entry" is limited to a particular locality and hardly suggests continuity. Hence a specific venue provision in § 279 of the Act was required before illegal entry cases could be prosecuted at the place of apprehension. 66 Stat. 230, 8 U.S.C. § 1329. This reasoning underlay the request for specific legislation by the Immigration and Naturalization Service. See Analysis of S. 3455, 81st Cong., prepared by the General Counsel of the Service, p. 276–2. In contrast to illegal entry, the § 252(c) offense of willfully remaining is continuing in nature. A specific venue provision would be mere surplusage, since prosecutions may be insti-

---

**9.** The government's argument that the statute of limitations for DiSantillo's reentry was tolled because of his alleged intentional misrepresentations on his visa application leads to an anomaly. 8 U.S.C. § 1325 imposes punishment on "[a]ny alien who . . . (3) obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact . . . ." The same statute of limitations applicable to § 1326 is applicable to § 1325. *See* 18 U.S.C. § 3282. Thus, if we were to accept the government's argument, the statute of limitations would have run on the offense of misrepresentation, but would be tolled on the offense of which misrepresentation is not an element. We find no reason supporting such a result.

tuted in any district where the offense has been committed, not necessarily the district where the violation first occurred. *Id.* at 408 n.6, 78 S.Ct. at 878 n.6. Thus, in contrast to the approach the government takes here, the INS actively sought a specific venue provision for the offense described in § 1326 because it assumed that the offense was not continuing. The addition of § 1329,[10] the special venue provision, is therefore further demonstration that the congressional intent was not to treat § 1326 as a continuing offense.

■ Accordingly, we hold that an alien may not be indicted under § 1326 more than five years after he entered or attempted to enter the United States through an official INS port of entry when the immigration authorities have a record of when he entered or attempted to enter. If no record is possible because the entry was surreptitious and not through an official port of entry, the alien is "found" when his presence is first noted by the immigration authorities. This interpretation is congruent with the legislative intention. To the extent that *Alvarado-Soto, Bruno*, and *Rincon-Jimenez* examined surreptitious entries, this analysis is also consistent with their results.

In this case, appellant entered through the INS port of entry at New York on March 23, 1970, as evidenced by the official stamp on his immigrant visa. The five year statute of limitations for a prosecution under § 1326 began to run on that date. An indictment found January 16, 1979 was therefore substantially beyond the five year statute of limitations.

The judgment of conviction and sentence will be reversed and the proceedings remanded with a direction to dismiss the indictment.

---

10. 8 U.S.C. § 1329 provides in relevant part that "[n]otwithstanding any other law, such prosecutions or suits may be instituted at any place in the United States at which the violation may occur or at which the person charged with a violation under section 1325 or 1326 of this title may be apprehended."