

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-16-2004

# USA v. Lennon

Precedential or Non-Precedential: Precedential

Docket No. 02-4207

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Lennon" (2004). *2004 Decisions*. Paper 551.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/551

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

_____

No. 02-4207

_____

UNITED STATES OF AMERICA

v.

CHRISTINE ANNEMARIE LENNON,

Christine A. Lennon,
Appellant

_____

On Appeal from the United States
District Court for the Eastern District of
Pennsylvania
(Dist. Ct. No. 01-cr-00494-1)
District Judge: Honorable Ronald L.
Buckwalter

_____

Argued: March 24, 2004

Before: ROTH, AMBRO and
CHERTOFF, Circuit Judges.

(Filed: June16, 2004 )

PATRICK L. MEEHAN, Esq.
United States Attorney
LAURIE MAGID, Esq.

Deputy United States Attorney for Policy
and Appeals
ROBERT A. ZAUZMER, Esq.
Assistant United States Attorney, Senior
Appellate Counsel
LINWOOD C. WRIGHT, JR., Esq.
(Argued)
Assistant United States Attorney
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106-4476

Counsel for Appellee

STEPHEN A. MORLEY, Esq.   (Argued)
Morley, Surin & Griffin
325 Chestnut Street
Suite 1305-P
Philadelphia, PA 19106

Counsel for Appellant

_____

OPINION

_____

CHERTOFF, Circuit Judge.

Christine Lennon appeals a final judgment of conviction and sentence entered by the District Court. Lennon pled guilty to being "found in the United States, having knowingly and unlawfully re-entered the United States" in violation of 8 U.S.C. §§ 1326(a) and (b)(2). Lennon claims that the District Court's sentencing analysis violated her rights under the Constitution's Ex Post Facto

1

clause. In part, this analysis turns on defining the nature of the offense to which Lennon pled. We have jurisdiction under 28 U.S.C. § 1291 and, for the reasons that follow, we will affirm.

I.

Lennon entered the United States in 1981 at the age of 17 as a lawful permanent resident. She is a single mother of three children, all American citizens by birth. She has maintained a close relationship with her children and has provided for them despite receiving no support from their three biological fathers.[1] She also suffers from Graves' disease, an autoimmune disorder.

Lennon's means of providing for herself and her children have not always been legal. In 1983, at age nineteen and only two years after assuming legal permanent residency in the United States, Lennon committed a shoplifting offense. She was convicted in 1988 and received a $300 fine. That year, Lennon was also charged with and convicted of violating the Pennsylvania Controlled Substance Act, when drugs and drug paraphernalia were found in her apartment. She served 28 months of her 27 to 53 month sentence. In 1992, she was convicted of aggravated assault on a New Jersey State Trooper. Lennon led the Troopers on a high-speed chase that reached speeds over 100 miles per hour and ended when she struck a different Trooper's vehicle with her car.[2] Lennon was sentenced to four years imprisonment, but was paroled to INS custody for deportation due to her criminal activity.

Lennon was deported to her native Jamaica on September 24, 1993. Eleven months after being deported, Lennon re-entered the United States under the pseudonym Diedra Barlow. She neither applied for admission to the United States nor obtained the express consent of the Attorney General before she re-entered. See 8 U.S.C. § 1326(a).

Soon after her illegal re-entry, Lennon resumed her violations of the law. She was convicted in 1996 of possession with intent to distribute marijuana.[3] That offense resulted in a sentence of sixty days imprisonment followed by three years probation. Lennon also pled guilty to shoplifting three times in 1998, receiving a probation sentence each of the last two times. Additional shoplifting charges

---

[1] The father of Lennon's second child, Ashley Esplante, was murdered in Philadelphia in 1993.

[2] In the arrest leading to the present charges, Lennon once again struck the vehicle of her arresting officers. She was apprehended by the Immigration and Naturalization Service (INS) while in her vehicle. Upon seeing the approaching agents, Lennon shifted her car into reverse and struck the INS vehicle that was parked behind her and intended to block her escape.

[3] Lennon pled *nolo contendere* in Los Angeles, California, Superior Court.

remain pending against her in Cherry Hill, New Jersey; Upper Merion Township, Pennsylvania; and Springfield Township, Pennsylvania.[4] Grand larceny and grand theft charges remain pending against her in, respectively, Orange County and Palm Beach County, Florida.

Lennon eventually came to the attention of INS officials as a result of an anonymous tip and was apprehended on July 7, 2001. She was indicted for, and pled guilty to, being "found in the United States, having knowingly and unlawfully re-entered the United States" in violation of 8 U.S.C. §§ 1326(a) and (b)(2) (hereinafter "Section 1326"). J.A. at 32. Section 1326(a) contains three separate offenses, phrased in the disjunctive: (1) illegal re-entry, (2) attempted illegal re-entry, and (3) being found illegally in the United States. See United States v. DiSantillo, 615 F.2d 128, 134 (3d Cir. 1980).

At sentencing, Lennon contended that the indictment ambiguously charged her both with illegal re-entry, and with being illegally "found in" the United States. The Government asserted that that Lennon was charged only with the "found in" charge of Section 1326(a) and contended that such a violation is a continuing one, starting on the date (or approximate date) of her actual re-entry in 1994 and running through her apprehension in 2001. That being so, the Government advocated including as criminal history enhancements two of Lennon's crimes that "occurred" for criminal history purposes fewer than ten years before her 1994 re-entry date but more than ten years before the date in 2001 on which she was "found," in the sense of being actually apprehended.

Lennon also argued that, whatever crime she was charged with, the 1993 Sentencing Guidelines should apply because her crime was completed upon her illegal re-entry in 1994. The Government disagreed, pointing out that Section 1326 enumerates being "found in" as a criminal offense that is distinct from unlawful re-entry. The Government argued that because her "found in" violation was continuing, it was "committed" at the time she re-entered through the date when she came to the attention of INS officials in 2001. Under that theory, the 1993 version of the Guidelines was inapplicable.

In the alternative, Lennon argued that the District Court should use the November 2000 version of the Guidelines—those in effect on the date she was apprehended by INS officials—rather than the November 2001 version of the Guidelines—those in effect on the date she was sentenced. The Government contended that use of the November 2001 Guidelines was appropriate and gave rise to no Ex Post Facto issue.

In imposing sentence, the District Court first held that Lennon's crime was

---

[4] Lennon was also charged with shoplifting in 1989 but the charges were dismissed.

committed on the date she was "found"—thus falling under the "found in" prong of Section 1326. The District Court looked to the November 2001 Guidelines, Section 2L1.2, to find Lennon's base offense level to be 8. The District Court then applied the 16 point enhancement in Section 2L1.2(b)(1)(A)—based either on Lennon's aggravated assault conviction (2L1.2(b)(1)(A)(ii)) or her possession with intent to distribute conviction (2L1.2(b)(1)(A)(i)). Next, the District Court reduced her offense level by three points for acceptance of responsibility under Section 3E1.1 for a total offense level of 21.

Finally, the District Court looked to Lennon's extensive criminal history in order to assign her a criminal history score. The District Court did consider under Section 4A1.2(e) those of Lennon's offenses that occurred more than ten years before her 2001 "found" date—implicitly holding that "found in" violations are continuing crimes—and assigned her four criminal history points for those offenses. The District Court assigned an additional 8 points under Section 4A1.2(e) for those of Lennon's crimes that occurred within ten years before her "found" date. The District Court designated a total criminal history category of V. The District Court determined, however, that this criminal history was overstated, and reduced it to a category IV, making her sentencing range 57-71 months. See U.S. SENTENCING GUIDELINES MANUAL § 4A1.3 (2001). The District Court imposed a sentence of 57 months imprisonment. Lennon timely appealed and maintains that the District Court violated her rights under the Constitution's Ex Post Facto clause.

We exercise plenary review over the District Court's interpretation of the Sentencing Guidelines and constitutional questions. See United States v. Cicirello, 301 F.3d 135, 137 (3d Cir. 2002); United States v. Spinello, 265 F.3d 150, 153 (3d Cir. 2001); United States v. Figueroa, 105 F.3d 874, 875-76 (3d Cir. 1997). We review the District Court's factual findings for clear error, see Cicirello, 301 F.3d at 137, and the District Court's application of those facts to the Guidelines for an abuse of discretion. See Buford v. United States, 532 U.S. 59, 62-66 (2001); United States v. Zats, 298 F.3d 182, 185 (3d Cir. 2002). In this context, we consider each of Lennon's claims in turn.

II.

The Ex Post Facto clause provides: "No Bill of Attainder or ex post facto Law shall be passed." U.S. CONST. art. I, § 9, cl. 3; see also U.S. CONST. art. I, § 10, cl. 1. A law does not run afoul of the Ex Post Facto clause unless it retroactively "alters the definition of criminal conduct or increases the penalty by which a crime is punishable." Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 506 n.3 (1995); see also, e.g., Lynce v. Mathis, 519 U.S. 433, 440-41 (1997) (citing Calder v. Bull, 3 U.S. (Dall.) 386, 390 (1798)); United States v. Brady, 88 F.3d 225, 227 (3d Cir. 1996) (citing Cummings v. Missouri, 71 U.S. (4 Wall.) 227, 326-26 (1866)). The

Sentencing Guidelines—along with all statutes that impose or dictate sentence—are, of course, subject to the Ex Post Facto clause. See Miller v. Florida, 482 U.S. 423, 429-35 (1987); United States v. Kopp, 951 F.2d 521, 526 (3d Cir. 1991); see also U.S. SENTENCING GUIDELINES MANUAL § 1B1.11 (2003). But a District Court is entitled to employ the Guidelines in place at the time of sentencing unless doing so would expose the defendant to harsher penalties than were in effect at the time the crime was committed. See United States v. Corrado, 53 F.3d 620, 622-23 (3d Cir. 1995). In order to establish, therefore, that the Ex Post Facto clause requires the application of an earlier version of the Sentencing Guidelines, a defendant must show that the crime was committed at a time that the earlier Guidelines version was in force and that the earlier version is more favorable to him or her. See United States v. Audinot, 901 F.2d 1201, 1202 (3d Cir. 1990).

### A.

Lennon first contends that the version of the Guidelines in force on the date of her 1994 re-entry—the 1993 Guidelines—should have been used to calculate her sentence. Those guidelines would have been more favorable to her because, she argues, she would have faced—before a reduction for acceptance of responsibility—a total offense level of 8, rather than the level 24 the District Court calculated under the November 2001 Guidelines.[5]

The key to this argument is Lennon's claim that the Section 1326 violation to which she pled guilty was committed in 1994, when she illegally re-entered the United States and when the 1993 Guidelines were in force. First, Lennon asserts that the indictment is

_____

[5] Lennon argues that none of the enhancements in the 1994 Guidelines would have applied to her. She contends that her New Jersey aggravated assault conviction would not have met the definition of "aggravated felony" under the 1993 Guidelines because it was not "a crime of violence . . . for which the term of imprisonment imposed . . . is at least 5 years." U.S. SENTENCING GUIDELINES § 2L1.2, cmt. n.7 (1993); 8 U.S.C. § 1101(a)(43)(F) (1995). She concludes that, because none of the other enhancements would have applied to her, her total offense level would have equaled the base offense level of 8. Neither party addressed whether Lennon's 1988 Pennsylvania controlled substance conviction would have qualified as an aggravated felony under subsection 1101(a)(43)(B) as "illicit trafficking in a controlled substance," making the 1993 Guidelines' aggravated felony enhancement nonetheless applicable to her. Because it does not change our analysis, we assume that her 1988 Pennsylvania controlled substance conviction would not have qualified as an "aggravated felony" within the meaning of the 1993 Guidelines.

5

ambiguously worded to charge both the "re-entry" prong and the "found in" prong of Section 1326.[6] She invokes the "rule of lenity," see United States v. Lainer, 520 U.S. 259, 266 (1997), and argues that the crime with which she is charged should be deemed to be illegal re-entry in 1994 because the 1993 Guidelines are more lenient than the 2001 Guidelines under which she was sentenced.

This is not a reasonable application of the rule of lenity. Notwithstanding the reference to Lennon's "re-entry," the indictment clearly charges her under the "found in" prong of Section 1326. See United States v. Whittaker, 999 F.2d 38, 40-41 (2d Cir. 1993) (concluding that alien's crime occurred for sentencing purposes on alien's "found" date even though the indictment charged all three prongs of Section 1326).

Next, though somewhat obliquely, Lennon argues that even if her violation was being "found in" the United States illegally, that offense occurred as a matter of law at the time she illegally crossed into the United States in 1994 through a recognized port of entry. This argument is on somewhat stronger footing, flowing from this Court's decision in United States v. DiSantillo, 615 F.2d at 134-36,[7] which

we need to discuss at some length.

In DiSantillo, the defendant had been arrested and deported in 1962. Id. at 130. He re-entered the United States in 1970, under his own name and on an immigrant visa issued by the American Consul General in Italy. But because of his earlier deportation, that visa was improper and DiSantillo's re-entry was in violation of Section 1326. Id.

DiSantillo was not interviewed by INS agents until 1976 and not indicted—under Section 1326's "found in" prong—until 1979. Id. He argued that the five-year statute of limitations for his "found in" violation began to run on his re-entry into the United States and expired in 1975. Id. at 132. The Government argued that DiSantillo's offense was a continuing one, "effectively tolling the statute of limitations for as long as the alien remain[ed] illegally in the country." Id. at 132.

We looked to the plain language of Section 1326 and held that the statute of limitations for a "found in" violation begins on the date the alien comes to the attention of immigration authorities. Id. at

---

[6] Lennon does not assert, however, that the ambiguity in the indictment renders it duplicitous.

[7] We note that Lennon's argument could be construed as a means of contending, by way of the back door, that

the statute of limitations has run on her "found in" violation. See DiSantillo, 615 F.2d at 134-36. But Lennon unquestionably waived any argument she may have had based on the statute of limitations by failing to raise that defense before the District Court. Accordingly, we voice no opinion with respect to that defense.

135. Central to our holding was the fact that DiSantillo had passed through a recognized port of entry pursuant to an otherwise valid American-issued visa under his own name. That being so, his re-entry was not surreptitious, and immigration authorities had sufficient notice of that re-entry to start the running of the five-year statute of limitations for his "found in" offense. We contrasted, in a dictum, DiSantillo's case with the example of an alien who enters the United States surreptitiously. Id. at 134-36. Under those circumstances, we reasoned, Congress did not intend the statute of limitations for "found in" violations to begin running against the Government on the date of the alien's illegal re-entry into the United States. Rather, as in the case of DiSantillo's non-surreptitious re-entry, the statute of limitations only begins to run once the Government is on notice of the alien's illegal presence in the United States.

In short, DiSantillo held that illegal re-entry begins, for statute of limitations purposes, when the alien presents himself non-surreptitiously (i.e., using his own name) at an open point of entry even though immigration personnel failed to react. That makes some sense because the Government has sufficient notice of the alien's presence in the United States to bear the burden of the running of the statute of limitations against it. Id. Here, however, Lennon admits that she used an alias when she crossed into the United States. The logic of DiSantillo—that immigration authorities should be imputed with "knowledge" of an alien's presence in the United States—does not extend to a case such as this, where Lennon affirmatively concealed her identity. To hold otherwise would actually favor the illegal entrants who affirmatively conceal their identities over those who honestly use their own names.[8]

---

[8] The Government urges that the crime of being "found in" the United States is a continuing offense, just in the same way that a conspiracy is. See, e.g., United States v. Jake, 281 F.3d 123, 129 n.6 (3d Cir. 2002). The argument has force; the passage of time does not give rise to a de facto amnesty that legalizes an unlawful alien's presence. But the question of whether "found in" violations are continuing crimes was addressed, to a limited extent, in our holding in DiSantillo. 615 F.2d at 134-36. In the context of that case, we held that the "found in" prong did not codify a continuing crime. Id. Since that time, numerous other courts have taken positions that are, to varying degrees, to the contrary. See United States v. Ruiz-Gea, 340 F.3d 1181, 1189 (10th Cir. 2003); United States v. Mendez-Cruz, 329 F.3d 885, 889 (D.C. Cir. 2003); United States v. Lopez-Flores, 275 F.3d 661, 663 (7th Cir. 2001); United States v. Mendez-Casillas, 272 F.3d 1199, 1203-05 (9th Cir. 2001); United States v. Ruelas-Arreguin, 219 F.3d 1056, 1061 (9th Cir. 2000); United States v. Reyes-Nava, 169 F.3d 278, 279-80 (5th Cir. 1999)); United States v. Diaz-Diaz, 135 F.3d 572, 575

This reading of DiSantillo is consistent with the decisions of other courts, holding that the offense of being "found in" the United States illegally is "committed" when the alien comes to the affirmative attention of INS officials. See United States v. Rodriguez, 26 F.3d 4, 8 (1st Cir. 1994); United States v. Gonzales, 988 F.2d 16, 18 (5th Cir. 1993); Whittaker, 999 F.2d at 40-42. Indeed, in Whittaker, the Second Circuit interpreted Section 1326 as we do here: Where an alien unlawfully enters with a fictitious name, even through a recognized port of entry, he is "found in" the United States when actually discovered. Whittaker, 999 F.2d at 42. Accordingly, Lennon's Section 1326 violation was "committed" when she was apprehended by INS officials in 2001.

Finally, Lennon observes that a logical implication of a finding that her crime was "committed" in 2001 is that her pre-1991 crimes should not have been used as sentencing factors, since they "occurred" for sentencing purposes before the Guidelines' ten year look-back period as measured from her "found" date. But

_____

(8th Cir. 1998); United States v. Castrillon-Gonzales, 77 F.3d 403, 406 (11th Cir. 1996); see also United States v. Almendarez, 1 Fed. Appx. 234, (4th Cir. 2001) (unpublished per curiam). But see United States v. Rivera-Ventura, 72 F.3d 277, 280-82 (2d Cir. 1995). Perhaps this should cause a re-examination of our holding in DiSantillo. But we need not confront the continued viability of DiSantillo in this case.

any error by the District Court in this respect was harmless.[9] Lennon concedes that, excluding her pre-1991 crimes, her criminal history score was a Level IV. The District Court here ultimately sentenced her based on a criminal history of Level IV, arriving at the same sentencing range as would have resulted had the District Court excluded Lennon's pre-1991 crimes.[10] Thus, any error by the

_____

[9] The Government argues that there is no error because Lennon's offense was a continuing one, lasting from 1994 through 2001. This is arguably inconsistent with DiSantillo, but we need not reach the question.

[10] At oral argument, Lennon's counsel suggested that the District Court's use of the older crimes might be error even though the District Court applied the lower criminal history level. Lennon's counsel speculated that the District Court might have been inclined to reduce the criminal history category irrespective of whether that history reflected her pre-1991 crimes. All things being equal, the argument runs, if the District Court had not included her pre-1991 crimes but still found her criminal history to be overstated, her sentencing range—and presumably her sentence—would have been that much lower. Apart from being pure speculation, Lennon's counsel's argument was not advanced in her briefs. For the same reason that we will not consider an argument minted at the reply brief stage, we will not consider an argument made by counsel for the first

District Court in initially considering Lennon's pre-1991 crimes for criminal history purposes was harmless. See United States v. Knight, 266 F.3d 203, 208 (3d Cir. 2001) (noting that a sentencing error need not be remanded if "the record shows that the sentence was unaffected by the error."); United States v. Thayer, 201 F.3d 214, 229 (3d Cir. 1999).

B.

The only remaining question, then, is whether the District Court should have used the November 2000, rather than the November 2001, version of the Guidelines.

Lennon argues that the November 2000 version of the Guidelines was more favorable to her because the November 2001 Guidelines eliminated the downward departure provision under Section 2L1.1. Compare U.S. SENTENCING GUIDELINES MANUAL § 2L1.2 & cmt. 5 (November 2000) with U.S. SENTENCING GUIDELINES MANUAL § 2L1.2 (November 2001). Because the District Court used the November 2001 Guidelines, she was denied the opportunity for that additional departure.

As the Government points out, Lennon's criminal record would have prevented her from being considered for a downward departure under the November 2000 Guidelines. Section 2L1.2, comment 5 of the November 2000 Guidelines states:

_____

time at oral argument. See Nagle v. Alspach, 8 F.3d 141, 144 (3d Cir. 1993) .

Aggravated felonies that trigger the adjustment from subsection (b)(1)(A) vary widely. If subsection (b)(1)(A) applies, and (A) the defendant has previously been convicted of only one felony offense; (B) such offense was not a crime of violence or firearms offense; and (C) the term of imprisonment imposed for such offense did not exceed one year, a downward departure may be warranted based on the seriousness of the aggravated felony.

U.S. SENTENCING GUIDELINES MANUAL § 2L1.2 cmt. 5 (November 2000). Lennon arguably fails each of the Comment's three conditions. Contrary to condition (A), she had been convicted of two felonies—aggravated assault in New Jersey and violation of the Pennsylvania Controlled Substance Act. Contrary to condition (B), her aggravated assault offense probably qualified as an "aggravated felony" as defined under the November 2000 Guidelines.[11] And contrary to condition (C), her New Jersey aggravated assault conviction carried a sentence of longer than one year.

_____

[11] See U.S. SENTENCING GUIDELINES MANUAL § 4B1.2 cmt. n.1 (November 2000).

9

Since the downward departure provision was inapplicable to her, the November 2000 version of the Guidelines was no more favorable to Lennon than was the November 2001 version. That being so, the Ex Post Facto clause did not prevent her from being sentenced under the November 2001 Guidelines—the Guidelines in force at the time of her sentencing—and the District Court did not err by doing so.

## III.

For the foregoing reasons, we will affirm the judgment of the District Court.