**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jose GONZALEZ–MENDOZA,
Defendant–Appellant.**

No. 92–50390.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1993.

Decided Feb. 8, 1993.

Robert L. Swain, Federal Defenders of San Diego, Inc., San Diego, CA, for defendant-appellant.

Jay Alvarez, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: BROWNING, POOLE and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Jose Gonzalez–Mendoza (Gonzalez) appeals his conviction of being a deported alien found in the United States in violation of 8 U.S.C. § 1326. We remand.

## BACKGROUND

On October 6, 1987 a person named "Jose Alonzo" was arrested in Los Angeles, California for possession of cocaine for sale in violation of California Health and Safety Code § 11351. On December 17, 1987 Jose Alonzo entered a guilty plea to the lesser included offense of possession of cocaine in violation of Health and Safety Code § 11350(a). In the present proceeding a fingerprint expert for the government testified that the fingerprints taken of Jose Alonzo while in state custody were the same as those of Gonzalez.

Gonzalez was deported on December 23, 1988 following a mass deportation hearing before an Immigration Judge for 16 aliens, none of whom spoke English and none of whom were represented by counsel. The group was advised by the Immigration Judge, speaking through an interpreter, that they had a right to counsel, a right to present evidence, a right to continuance, and a right to appeal his ruling. Having ruled that each was deportable, the Immigration Judge asked anyone who was interested in an appeal to stand. No one stood. The hearing terminated.

On April 30, 1990, Gonzalez was arrested in San Diego, California for possession of a controlled substance in violation of California law. He was convicted of this charge on July 17, 1990 and sentenced to two years in custody in state prison. Prior to his conviction, on June 22, 1990 the Immigration and Naturalization Service (INS) placed a civil detainer with the state authorities noting that the INS was investigating Gonzalez for deportation.

On August 21, 1990 an INS officer completed a "Record of Deportable Alien" noting that Gonzalez was not eligible for legalization; that he was due for release from the state prison on April 30, 1991; that a bond was recommended on release to the INS of $5,000 because he was a "convicted criminal alien likely to abscond"; and that a "hold" had been placed on him on June 22, 1990. On April 9, 1991 an INS review of its own records certified that it had no record of Gonzalez applying for permission for readmission after his deportation in 1988.

On September 18, 1991 Gonzalez was released from state prison and turned over to the INS. On October 2, 1991 he was indicted for the present offense and on February 12, 1992 he was tried and convicted. Gonzalez appeals.

## ANALYSIS

*Alleged Violation of the Interstate Agreement on Detainers*

■ Gonzalez contends that the government violated the Interstate Agreement on Detainers, 18 U.S.C.App. § 2 (the IAD). The IAD sets stringent limits for the time in which a prisoner subject to a detainer must be brought to trial by the state filing the detainer. The trial must be commenced within 120 days of the arrival of the prisoner in the receiving state. IAD, Article IV(c). The United States did not comply with this provision.

The position of the United States is that the IAD is completely inapplicable because the INS detainer or hold was civil. The United States points to the precise language of the IAD which declares it deals with detainers "based on untried indictments, informations or complaints," Article I, and specifically speaks in terms of a person as to whom there is pending "any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner." Article III(a). The structure of the IAD supposes that there is in existence some criminal charge against the detainee and goes on to permit the detained prisoner to request from a court "a final disposition to be made of the indictment, information or complaint." *Id.*

The civil detainer filed by the INS was not an indictment, information or complaint. There was no way in which a court could have been requested to make "a final disposition" in its regard. The INS's notice to the state prison does not fall within the terms of the IAD.

Gonzalez argues that in substance, if not in form, the INS had signalled to the state to hold him for criminal prosecution by the United States. And even if Gonzalez had not been subject to federal prosecution as an alien who had returned to the country in violation of law, the INS August 1990 "Record of Deportable Alien" indicated that he was subject to deportation. Deportation is a sanction as harsh or harsher than many sanctions provided by the criminal law. *See, e.g., Lok v. Immigration and Naturalization Service,* 548 F.2d 37, 39 (2d Cir.1977) ("Deportation is a sanction which in severity surpasses all but the most Draconian criminal penalties.").

Nonetheless, the courts have declined to treat deportation as a criminal proceeding, and the INS's actions of June and August 1990 did not show the INS contemplated a criminal proceeding. The IAD is an agreement that must be construed according to its explicit terms. As both the House and Senate Reports state, a detainer advises a prisoner "that he is wanted to face pending criminal charges in another jurisdiction." H.R.Rep. No. 91–1018, p. 2 (1970), S.Rep. No. 91–1356, p. 2 (1970), U.S.Code Cong. & Admin.News 1970, pp. 4864, 4865. The history of the law, as expounded by the Supreme Court, shows that the genesis of the IAD was the work of a committee dealing with "persons accused of multiple offenses." *United States v. Mauro,* 436 U.S. 340, 350, 98 S.Ct. 1834, 1842, 56 L.Ed.2d 329 (1978). There is nothing in the INS actions in 1990 to indicate that Gonzalez was being charged with another offense. No criminal charge of any kind had been filed against him.

Gonzalez points out that on April 9, 1991 the government completed a review of the INS's record system and the reviewer certified that there was no evidence of Gonzalez filing an application for permission to reapply for admission to the United States after deportation. Gonzalez rightly notes that this certificate was a step in preparing a criminal prosecution against him. The certificate, however, was not brought to the attention of the state prison, nor was it itself a criminal charge. It was a mere internal memo until used at trial. There is nothing in the IAD that triggers its time requirements if a prosecutor in one jurisdiction takes steps to prepare a case against a prisoner being held by another jurisdiction. Accordingly, Gonzalez cannot benefit from the IAD's provisions on when prosecution must begin.

*The Evidence of Gonzalez's Identity*

■ Gonzalez contends that "nothing in the record" links the fingerprints taken in

October 1987 to the record of the conviction in December 1987. Gonzalez adds that while the name "Jose Alonzo" is on both documents, the fingerprint card had an a/k/a of "Jorge Alberto Manzon" while the later document has no such a/k/a. Moreover, the crime of which "Jose Alonzo" was convicted in December was not the same as the crime for which he was arrested in October.

These were appropriate arguments to make to the jury. But the jury was not irrational, nor without sufficient evidence, when it drew the inference that the "Jose Alonzo" arrested for possession of cocaine for sale in October 1987 was the same Jose Alonzo who pleaded guilty to possession of cocaine on December 17, 1987. The fingerprints on the October document were shown to have been recorded in October without the possibility that someone else's fingerprints could have crept onto the document. It was not disputed that these fingerprints were the fingerprints of Gonzalez. His conviction of the drug offense was established.

*The Prior Deportation Hearing*

■ The failure of the Immigration Judge conducting the prior immigration hearing to be certain that Gonzalez was knowingly waiving his right to appeal is evident. The government always has the obligation to prove "an intentional relinquishment or abandonment of a known right or privilege." *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). A court "should not presume acquiescence in the loss of fundamental rights." *Barker v. Wingo,* 407 U.S. 514, 525–26, 92 S.Ct. 2182, 2189, 33 L.Ed.2d 101 (1972) (quoting *Ohio Bell Tel. Co. v. Public Utilities Comm'n,* 301 U.S. 292, 302, 57 S.Ct. 724, 729, 81 L.Ed. 1093 (1937)). Silent waiver by the whole group of aliens fails to overcome the presumption against waiver. Gonzalez was denied due process.

■ Relying on the panel opinion in *United States v. Proa–Tovar,* 945 F.2d 1450 (9th Cir.1991), *superseded by* 975 F.2d 592 (9th Cir.1992) (en banc), Gonzalez made no effort at his trial in this case to show prejudice from denial of his due process rights. It has now been authoritatively decided that to overturn a prior deportation order the defendant must show that he was prejudiced by being deprived of the right to an appeal from the order and that it is his burden to show the prejudice. *Proa–Tovar,* 975 F.2d at 595. If Gonzalez should make a prima facie showing of prejudice, the burden then shifts to the government to show that the due process violation could not have changed the outcome of the deportation proceeding. *United States v. Cerda–Pena,* 799 F.2d 1374, 1379 (9th Cir. 1986).

Because neither Gonzalez nor the district court considered the question of prejudice and the record is incomplete, we are unable to determine whether Gonzalez can provide "some concrete evidence indicating that the violation of [his right to appeal] actually had the potential for affecting the outcome of [the] deportation proceedings." *Id.* Accordingly, we remand to the district court for consideration of this issue.

REMANDED.