UNITED STATES of America, Appellee,

v.

Javier Dario GOMEZ, Appellant.

No. 94–1228.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 16, 1994.

Decided Oct. 28, 1994.

Rehearing Denied Nov. 29, 1994.

Robert J. Lohr, Clayton, MO, argued, for appellant.

Suzanne Modlin, Asst. U.S. Atty., St. Louis, MO, argued, for appellee.

Before McMILLIAN and MAGILL, Circuit Judges, and BOGUE,* Senior District Judge.

* THE HONORABLE ANDREW W. BOGUE, Senior United States District Judge for the District of South Dakota, sitting by designation.

MAGILL, Circuit Judge.

Javier Dario Gomez appeals the district court's [1] denial of his motion to dismiss an indictment under 8 U.S.C. § 1326(b)(2), arguing that the district court erred in denying his motion because the five-year statute of limitations had expired before the indictment was obtained. Because we disagree with Gomez's interpretation of "found in" as used in § 1326(a)(2), we affirm.

## I. BACKGROUND

Gomez illegally entered the United States in 1979. In 1984, Gomez (under the name Rodrigo Rojas Gomez) was sentenced by a Texas state court to five years imprisonment for delivering a controlled substance (cocaine). On June 14, 1985, Gomez was physically deported to Colombia. At that time, the Immigration and Naturalization Service (INS) file under the name Rodrigo Rojas Gomez contained a set of Gomez's fingerprints.

Sometime between June 14, 1985, and May 2, 1988, Gomez entered the United States surreptitiously without inspection by INS officers. On May 3, 1988, Gomez appeared at an INS Legalization Office in New York City and filed an INS Form I–687 under the name Javier Dario Gomez.[2] This form contained numerous false statements and provided virtually no truthful biographical data. Gomez provided a set of fingerprints and the social security number that he used as Rodrigo Rojas Gomez in 1984 in connection with his application.[3] Gomez was granted temporary resident alien status, which was later adjusted to permanent resident alien status.

On November 5, 1992, a theft of jewelry occurred in St. Louis County, Missouri. Go-mez was implicated in this crime by a fingerprint found on evidence relating to the theft. The FBI and INS matched this print with prints contained in Javier Dario Gomez's file. Gomez was arrested on February 3, 1993, by the West New York, New Jersey Police Department. An FBI comparison of fingerprints revealed that Javier Dario Gomez and Rodrigo Rojas Gomez were the same person. On May 7, 1993, five years and four days after Gomez's May 3, 1988 visit to the INS Legalization Office in New York, an indictment alleging that Gomez violated 8 U.S.C. § 1326(a) was filed. A superseding indictment alleging violation of 8 U.S.C. § 1326(b) was filed on August 12, 1993.

On August 23, 1993, an evidentiary hearing was held before Magistrate Judge David Noce to establish the facts necessary to decide Gomez's Motion to Dismiss for Lack of Subject Matter Jurisdiction.[4] The magistrate judge recommended denying Gomez's motion, and the district court adopted the recommendation over Gomez's written objections. Gomez entered a conditional plea of guilty, reserving the right to appeal the denial of his motion, and was sentenced to a term of forty-one months imprisonment which he is now serving.

## II. DISCUSSION

8 U.S.C. § 1326(b) establishes a penalty for any alien who enters, attempts to enter, or is "found in" the United States without the permission of the Attorney General after having been arrested and deported or excluded and deported.[5] This offense may be com-

---

1. The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

2. Form I–687 is entitled "Application for status as a temporary resident (section 245A INA)." The application is one aspect of the Amnesty (or Legalization) Program set forth in 8 U.S.C. § 1255a (INA § 245a) under which certain aliens who illegally entered the United States could attain legal status through the INS. The Amnesty Program is carefully separated from regular INS operations.

3. Both this number and a second social security number given by Gomez had been assigned to other persons. The INS identification system relies upon name, date and place of birth (which

were falsified by Gomez), and confirmation through fingerprinting. Social security numbers are not used as a primary means of identification, and the numbers given are frequently fraudulent.

4. Although the motion raises the affirmative defense statute of limitations, it is styled as a jurisdictional challenge. See United States v. DeTar, 832 F.2d 1110, 1114–15 (9th Cir.1987).

5. Section 1326(a) reads:

(a) Subject to subsection (b) of this section, any alien who—

(1) has been arrested and deported or excluded and deported, and thereafter

mitted in three distinct manners: a previously deported alien may violate § 1326 by, without the Attorney General's permission, (1) entering, (2) attempting to enter, or (3) being found in the United States. *United States v. Rodriguez*, 26 F.3d 4, 8 (1st Cir. 1994); *United States v. Whittaker*, 999 F.2d 38, 41 (2d Cir.1993); *United States v. Gonzalez*, 988 F.2d 16, 18 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 170, 126 L.Ed.2d 129 (1993).

Gomez's primary argument is that his May 3 visit to the INS Legalization Office was an "entry" into the United States and that the five-year statute of limitations began to run on that date. Gomez also argues that if not an entry, his visit to the INS Legalization Office was sufficient to alert the government to his presence in the United States, and thus completed the § 1326 offense and triggered the statute of limitations to run. We address each of these arguments in turn.

### A. Did Gomez "enter" the United States on May 3?

■ Gomez first argues that because he entered the United States through proper immigration channels (i.e., the INS Legalization Office in New York), the five-year statute of limitations began to run when he entered the United States. Gomez claims that his entry to the United States occurred on May 3, 1988, so that the May 7, 1993 indictment is barred by the five-year statute of limitations. We disagree.

■ The five-year statute of limitations for prosecutions under § 1326 begins running as soon as the offense is complete. *United States v. DiSantillo*, 615 F.2d 128, 134–35 (3d Cir.1980). The offenses of entry and attempted entry are complete when the deported alien enters or attempts to enter through a recognized INS port of entry. *Id.* at 135 (entry); *see United States v. Cardenas–Alvarez*, 987 F.2d 1129 (5th Cir.1993) (attempted entry). Thus, when the alien enters (or attempts to enter) through a recognized port of entry, the statute of limitations begins to run as soon as the (attempted) entry is effected. *DiSantillo*, 615 F.2d at 137. If, however, the alien's entry is "surreptitious," there is no such entry [6] to trigger the statute to run. *Id.* In contrast to entry

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act, shall be fined under Title 18, or imprisoned not more than 2 years, or both.

Section 1326(b) provides for enhanced penalties if the deportation that satisfies § 1326(a)(1) was subsequent to a conviction of a felony or an aggravated felony:

(b) Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection—

(1) whose deportation was subsequent to a conviction for commission of a felony (other than an aggravated felony), such alien shall be fined under Title 18, imprisoned not more than 5 years, or both; or

(2) whose deportation was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such Title, imprisoned not more than 15 years, or both.

Aggravated felony is defined by 8 U.S.C. § 1101(a)(43):

(43) The term "aggravated felony" means murder, any illicit trafficking in any controlled substance (as defined in section 802 of Title 21), including any drug trafficking crime as defined in section 924(c)(2) of Title 18, or any illicit trafficking in any firearms or destructive devices as defined in section 921 of such title, any offense described in section 1956 of Title 18 (relating to laundering of monetary instruments), or any crime of violence (as defined in section 16 of Title 18, not including a purely political offense) for which the term of imprisonment imposed (regardless of any suspension of such imprisonment) is at least 5 years, or any attempt or conspiracy to commit any such act. Such term applies to offenses described in the previous sentence whether in violation of Federal or State law and also applies to offenses described in the previous sentence in violation of foreign law for which the term of imprisonment was completed within the previous 15 years.

**6.** In such a case, the alien has obviously "entered" the United States. However, in order to give effect to each of the terms used by Congress, *DiSantillo* and those cases that follow it have consistently distinguished regular and surreptitious entries. *See, e.g., DiSantillo*, 615 F.2d at 134–35.

and attempted entry, a "found in" violation is a continuing violation that is not complete until the alien is "discovered" by immigration authorities. Only at this point does the statute of limitations on a "found in" violation begin to run. *Id.*

The magistrate judge's order and recommendation, which was "sustained, adopted and incorporated" by the district court, contained an explicit factual finding that: "Between June 14, 1985, and May 2, 1988, defendant [Gomez] entered the United States surreptitiously without inspection by the INS." Order and Recommendation of United States Magistrate at 4 (Sept. 2, 1993). We must accept this factual finding unless it is clearly erroneous. *Hernandez v. New York,* 500 U.S. 352, 365–66, 111 S.Ct. 1859, 1869–70, 114 L.Ed.2d 395 (1991).

▇▇▇ This finding was taken virtually verbatim from the parties' joint motion to amend the stipulation of facts, and we find no evidence to contradict its substance. Indeed, the evidence before the magistrate judge supports this finding. This evidence indicates that the Amnesty Program under § 1255a is a specially administered program designed to change the status of illegal aliens who have *already entered* the United States. *See* 8 U.S.C. § 1255a(a)(2)(A) ("alien must establish that he *entered* the United States before January 1, 1982") (emphasis added); 8 U.S.C. § 1255a(a)(3)(A) ("alien must establish that the alien has been continuously physically present"). The instructions to Form 687 parallel § 1255a and confirm this analysis. INS Form I–687 Instructions at 1 (discussing "Eligibility" in terms of entry into the United States). Moreover, the Legalization Office is a distinct branch of the INS that normally is not to disclose information to "regular" immigration authorities. *See* 8 U.S.C. § 1255a(c)(5). Gomez's visit to the INS Legalization Office on May 3, 1988, is therefore not an "entry" into the United States, and the district court's acceptance of the magistrate judge's finding of surreptitious entry prior to the May 3 visit is not clearly erroneous.

Because Gomez entered the United States surreptitiously, there was no recorded entry to trigger the statute of limitations. For this reason, Gomez's reliance upon *DiSantillo* is misplaced. *DiSantillo* was a prosecution under the "entry" provision of the statute, and merely held that "an alien may not be indicted under § 1326 more than five years after he entered or attempted to enter the United States through an official INS port of entry when the immigration authorities have a record of when he entered or attempted to enter." 615 F.2d at 137. The rationale for this holding is that in a regular entry through a recognized port, "[t]he immigration authorities [know of the alien's] entry and could have, through the exercise of diligence typical of law enforcement authorities, discovered [the] violation at that time." *Id.* at 135. *DiSantillo* went on to state that "[i]f no record is possible because the entry was surreptitious and [7] not through an official port of entry, the alien is 'found' when his presence is first noted by the immigration authorities." *Id.* at 137 (footnote added). This distinction is supported by principles of statutory construction, *id.* at 134–35, and the observation that when entry is surreptitious, there is no record of entry. "Only the alien knows the precise date of his surreptitious entry" which evinces a knowledge that the alien is in violation of the law. *Id.* at 135. Thus, *DiSantillo* is distinguishable because it involved an "entry" violation that is complete when entry is made whereas this appeal involves a surreptitious entry and the continuing offense of being "found in" the United States. *DiSantillo* addresses this distinction in dicta, and is therefore of no assistance to Gomez. Because the statute of limitations for the "found in" violation does not begin to run until Gomez was "found," we turn to that issue.

**B. Was Gomez "found in" the United States before May 7, 1988?**

**1. Was Gomez found on May 3, 1988?**

▇▇▇ Although Gomez styles his May 3 visit to the INS Legalization Office as an

---

**7.** Although *DiSantillo* uses the conjunction "and," later cases make clear that the nature of the entry (i.e., whether or not it is surreptitious) is controlling, not the location of entry. *See Whittaker,* 999 F.2d at 42. We note that even if

the May 3 visit is construed as an entry, it was a surreptitious entry, thus it would not trigger the running of the statute of limitations. *See id.* at 42.

"entry," the district court considered the visit in connection with the "found in" provision. The central issue is whether Gomez was found in the United States when he visited the INS Legalization Office on May 3. If Gomez was found in the United States on May 3, the prosecution is time barred. If Gomez was not found in the United States until after May 7, 1988,[8] the prosecution is not time barred. We review the district court's application of the statutory language to the historical facts de novo. *United States v. Brummels*, 15 F.3d 769, 771 (8th Cir.1994).

This appeal requires us to decide exactly what must be known to the government before a defendant alien is "found in" the United States. Although this appears to be an issue of first impression, several other circuits have addressed analogous situations, and their reasoning provides guidance. The prevailing view is that an alien is "found in" the United States when that alien is "discovered in" the United States. *United States v. Canals–Jimenez*, 943 F.2d 1284, 1287 (11th Cir.1991) ("The phrase 'found in' is synonymous with 'discovered in.'"); *Whittaker*, 999 F.2d at 41 (alien's being found in United States means "his presence is discovered"); *DiSantillo*, 615 F.2d at 137 (alien is found when "his presence is first noted by the immigration authorities"); *United States v. Meraz–Valeta*, 26 F.3d 992, 997 (10th Cir. 1994).

Implicit in the analysis of our sister circuits is the idea that discovery consists of two elements.[9] First, the physical presence of the deported alien in the United States must be discovered. *Whittaker*, 999 F.2d at 41 (previously deported alien's being found in United States means "his *presence* is discovered") (emphasis added); *DiSantillo*, 615 F.2d at 137 (previously deported alien is found when "his *presence* is first noted by the immigration authorities") (emphasis added). The INS was certainly aware of Gomez's presence when he visited the office on May 3.

The second necessary element of the discovery is to ascertain the identity and status of the previously deported alien. *Whittaker*, 999 F.2d at 41 (previously deported alien's being found in United States means "*his* presence is discovered") (emphasis added); *DiSantillo*, 615 F.2d at 137 (previously deported alien is found when "*his* presence is first noted by the immigration authorities") (emphasis added). The physical presence of any and every alien does not violate § 1326. Only the physical presence of a particular type of alien, that is, an alien who was previously deported, violates the statute. This aspect of discovery requires linking the presently perceived alien (Javier Dario Gomez) to a historical event (the deportation of Rodrigo Rojas Gomez), which occurs only when Javier Dario Gomez and Rodrigo Rojas Gomez are discovered to be the same person. This second aspect of discovery was not present during Gomez's May 3 visit to the INS Legalization Office. Although Gomez was obviously physically present in the INS Legalization Office, the information he provided the INS was designed to conceal his identity. Gomez filled out an I–687 application for temporary resident status using a different name than that under which he was previously convicted. He falsely stat-

---

8. A superseding indictment was filed on August 12, 1993. However, a superseding indictment filed while the original indictment is validly pending relates back to the time of filing of the original indictment if it does not substantially broaden or amend the original charges. *United States v. Davis*, 953 F.2d 1482, 1490–91 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2286, 119 L.Ed.2d 210 (1992); *United States v. Gengo*, 808 F.2d 1, 3 (2d Cir.1986).

9. Our sister circuits have not addressed the additional issues created by an alien's concealment of his identity because cases construing the "found in" provision have generally involved aliens apparently using only one name, *see, e.g., DiSantil-*

*lo*, 615 F.2d at 129–30 (alien omitted reference to prior arrest and deportation in visa application; no mention of aliases); *United States v. Gay*, 7 F.3d 200, 201 (11th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2141, 128 L.Ed.2d 869 (1994) (deported alien reentered United States using original passport before record of deportation made available to INS agents), or have involved less than five years between entry/original encounter and arrest, *see, e.g., Whittaker*, 999 F.2d at 39 (lapse of seven months); *United States v. Gonzalez–Mendoza*, 985 F.2d 1014 (9th Cir. 1993) (lapse of one year and four months), so that consideration of these issues was unnecessary.

ed that he had no other records with the INS. He concealed his previous arrest and deportation, and he changed his birth date. Thus, the INS did not "find" Gomez on May 3, 1988.

### 2. Was Gomez found between May 3 and May 7, 1988?

 As of May 3, the INS was in possession of an I–687 which contained much falsified data, but which also contained Gomez's fingerprints, a means by which the INS could determine Gomez's true identity and status as a deported alien. We must therefore decide whether knowledge of Gomez's identity and status should be attributed to the INS. If such knowledge is attributed to the INS, we must decide at what point in time the attribution should occur. We turn first to the issue of whether knowledge of Gomez's status should be attributed to the INS.

We are guided by the rule that "criminal limitations statutes are to be liberally interpreted in favor of repose." *United States v. Habig,* 390 U.S. 222, 227, 88 S.Ct. 926, 929, 19 L.Ed.2d 1055 (1968) (internal quotation and citation omitted). We are also mindful that continuing offenses are disfavored. *DiSantillo,* 615 F.2d at 134. The magistrate judge made a specific finding that all aliens participating in the Amnesty Program were to be fingerprinted and subjected to identification by the FBI. *Cf.* 8 C.F.R. § 245a.2(d), (e). We assume, although we do not hold, that the INS was negligent in failing to detect Gomez's status. Because the INS had in its possession Gomez's fingerprints as Rodrigo Rojas Gomez and as Javier Dario Gomez, and had access to the FBI facilities for fingerprint comparison, it possessed both the information and the means necessary to determine Gomez's status as a deported alien.

 Where the government is in possession of all necessary information and means, we see no reason why, consistent with the rule of lenity, the "discovery rule" governing the accrual of a cause of action for the purpose of commencing the statute of limitations should not apply. *See, e.g., Granite Falls Bank v. Henrikson,* 924 F.2d 150 (8th Cir.1991) (civil RICO cause of action accrues when plaintiff discovers, or reasonably should

have discovered, essential elements of RICO claim). The policies underlying civil and criminal statutes of limitations are similar. *United States v. Marion,* 404 U.S. 307, 323 n. 14, 92 S.Ct. 455, 464 n. 14, 30 L.Ed.2d 468 (1971). Were we to refuse to apply the discovery rule, Gomez (a criminal accused) would be in a worse position than would be a defendant in a civil action. Gomez, unlike a civil defendant, would be required to live in perpetual fear of prosecution. This approach would essentially strike the statute of limitations from the United States Code. A civil plaintiff's negligence in discovering and acting upon a cause of action deprives the plaintiff of her rights in order to give repose to a defendant. Similarly, where the government possesses all the necessary information, but negligently fails to act upon it for over five years, the injury suffered by the sovereign pales in comparison to the accused's right to repose. *See Marion,* 404 U.S. at 323, 92 S.Ct. at 464, 30 L.Ed.2d at 468.

 Our application of the discovery rule is confirmed by the reasoning of *DiSantillo. DiSantillo* held that the statute of limitations began to run at the time of an entry at a recognized port because "[t]he immigration authorities ... could have, through the exercise of diligence typical of law enforcement authorities, discovered [the] violation at th[e time of entry]." *DiSantillo,* 615 F.2d at 135. Applying the same reasoning to the "found in" provision, we believe that the statute of limitations for a "found in" violation should also begin running when immigration authorities could have, through the exercise of diligence typical of law enforcement authorities, discovered the violation. As the cases attest, the result of this diligence is that the time at which the immigration authorities should discover the violation is often at or near the time the defendant is taken into custody.

 Having concluded that knowledge of Gomez's status should be attributed to the government, we must now determine at what point in time that knowledge should be attributed. The magistrate judge found that the average time for FBI processing of fingerprint requests was forty-five calendar days. The INS was sufficiently satisfied that

if there was no negative response from the FBI after sixty days, applications for temporary resident alien status were routinely approved. The magistrate judge also found that there was nothing about Gomez's application that indicated a need for special or expedited treatment. Based on these findings, the *earliest possible* time at which the INS may have received reasonable notice that Gomez's file should be further pursued would have been if no report were received after the sixty-day non-response.[10] Thus, the earliest time at which lack of knowledge of Gomez's status may be attributed to negligence by the government is July 2, 1988, sixty days after the May 3, 1988 filing date. We therefore hold that Gomez was constructively "found in" the United States, and the violation of § 1326 was completed at the instant the immigration authorities should have, through the exercise of reasonable diligence, discovered Gomez's true identity. It follows from this analysis that the May 7, 1993 indictment was filed within the five-year statutory period, and that the district court correctly adopted the recommendation of the magistrate judge and denied Gomez's motion to dismiss the indictment.

### III. CONCLUSION

The district court properly denied Gomez's motion to dismiss the § 1326 indictment as untimely filed. Gomez surreptitiously entered the United States, and was indicted under the "found in" provision of § 1326. The May 3 filing gave the government all the information it needed to "find" Gomez. However, even assuming the government negligently failed to find Gomez, any negligence did not occur until at least July 1988. Thus, the indictment filed on May 7, 1993, was within the statutory period. Accordingly, the order of the district court is affirmed.

---

10. In reality, there would likely be no reason to suspect any problem with the application until sometime after 60 days had expired. This minimal delay is astonishing given the volume of applications received by the INS.