UNITED STATES of America,
Plaintiff,

v.

Alfredo SOTELO–SALGADO,
Defendant.

Criminal No. 02–15.

United States District Court,
S.D. Iowa.

May 7, 2002.

Edwin F. Kelly, Assistant United States Attorney, Des Moines, IA, for Plaintiff.

James F. Whalen, Iowa Federal Public Defender, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Before the Court is Defendant Alfredo Sotelo–Salgado's Motion to Dismiss the Indictment (# 17). The Government has filed a resistance to the motion and a hearing was held on April 25, 2002. The matter is fully submitted.

### I. FACTS

Defendant was deported from the United States to his native country of Mexico on June 18, 1993. *See* Def.'s Exh. A. According to the Defendant, he reentered the United States illegally in mid-September, 1993. He attempted to obtain a driver's license at the Department of Transportation ("D.O.T.") Office in Des Moines, Iowa on October 17, 1994. Defendant presented the D.O.T. examiner with an Immigration and Naturalization Service (I.N.S.) Form I–94 bearing his photo, date of birth, and address. While the form had actually expired on December 2, 1992, the I–94 form had been altered to show an expiration date of December 2, 1994. While processing Defendant's driver's license application, the D.O.T. received a computer message to notify I.N.S. before issuing a license.

In an I.N.S. prosecution report dated November 9, 1994, Special Agent Michael Wardy ("Agent Wardy") writes:

> The [I–94] form was lifted by Public Service Supervisor Dennis Kleen. . . . Kleen can testify that the individual who presented the I–94 is the same person in the photo on the form. This photo matches the photos contained in [Defendant's] alien file. . . . In addition to presenting the I–94 form as evidence, Kleen

also presented a time-lapse videotape . . . [Defendant] is seen at the front counter and in the waiting area. . . . [Defendant] appears amenable to prosecution for a violation of 8 USC 1326(a). . . .

*See* Def's Exh. B.

On December 21, 1994, Assistant United States Attorney Kevin VanderSchel sent a letter to Agent Wardy, informing him that a file had been opened on the Defendant, and that a case number and prosecutor had been assigned to the case. *See* Def.'s Exh. D. The record reflects no further action until April 20, 1995. On that date, Agent Wardy wrote a Memorandum of Investigation, wherein he indicated that investigation of Defendant's case had been deferred because of his possible involvement with certain individuals believed to be distributing methamphetamine. *See* Def.'s Exh. E. It appears from Agent Wardy's Memorandum that the individuals being investigated for drugs had been arrested and that he planned to pursue an indictment and arrest warrant for the Defendant. *Id.*

Nearly five months later, on September 5, 1995, another Memorandum of Investigation by Wardy indicates that the Assistant United States Attorney assigned to the case "does not want to obtain indictment unless arrest of SUBJECT is imminent." Def.'s Exh. F. Agent Wardy also noted that a prior known address for Defendant was no longer valid and that he had no current leads as to Defendant's whereabouts. *Id.* There is nothing in the record reflecting what, if any, steps the I.N.S. took to locate the Defendant after September 5.

On January 16, 2002, Defendant pled guilty in the Iowa District Court for Polk County to a charge of Operating While Intoxicated. *See* Def.'s Exh. G. He was sentenced to one year in prison, with all but 18 days suspended. *Id.* On January

17, 2002, while Defendant was serving that sentence, I.N.S. Agent Jim Walsh ("Agent Walsh") visited the Polk County Jail to interview the Defendant. On January 24, 2002, a one-count indictment was returned charging the Defendant with illegal reentry, pursuant to 8 U.S.C. § 1326. Thereafter, Defendant was taken into the custody of the I.N.S.

It appears from the record that Defendant had two other contacts with local law enforcement between September 5, 1995 and December 29, 2001, the date he was arrested for Operating While Intoxicated. Agent Walsh indicated that during both interim arrests, Defendant initially gave a false name. Agent Walsh testified that Defendant was arrested on August 18, 1997 for having no driver's license and for operating while intoxicated. Defendant's fingerprints were taken and submitted to the FBI during this arrest, however, Agent Walsh testified that the I.N.S. was not aware of the fingerprints or the arrest until his 2001 arrest. Defendant was also arrested June 14, 1999 for domestic abuse. His fingerprints revealed to authorities that his true name was Alfredo Sotelo–Salgado. Again, however the I.N.S. claims it was unaware of this information until Defendant's 2001 arrest.

## II. ISSUES AND ANALYSIS

### A. When Did the Statute of Limitations Begin to Run?

■ Defendant argues that his prosecution in this matter is barred by the statute of limitations. Specifically, Defendant contends that the I.N.S. knew of his presence in the Southern District of Iowa no later than November 9, 1994, and therefore, was required to indict no later than November 9, 1999. The Government counters that the statute of limitations was tolled because Defendant concealed his identity within the Southern District of Iowa by

using false names. The Government also urges that once Defendant undertook to conceal his identify, the statute of limitations began to run anew from the date Defendant was "newly found" utilizing a false or assumed name.

■ An individual can violate Title 8, United States Code, Section 1326 in three ways: (1) by entering, (2) by attempting to enter, (3) or by being found in the United States without permission from the Attorney General to reenter after previously being deported. See 8 U.S.C. § 1326(a)(2). The Indictment in this matter alleges Defendant committed the crime of being "found in" the United States after a previous deportation. "When an individual is 'found in' the United States, the date he or she is found is generally considered to be the date he or she violated § 1326." United States v. Estrada–Quijas, 183 F.3d 758, 761 (8th Cir.1999).

Title 18, United States Code, Section 3282 provides, "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3282. Thus, the first question the Court must address is, when was the Defendant "found in" the United States such that the statute of limitations began to run?

■ The Eighth Circuit has held that "an alien is 'found in' the United States when that alien is 'discovered in' the United States by immigration authorities." United States v. Diaz–Diaz, 135 F.3d 572, 577 (8th Cir.1998) (citing United States v. Gomez, 38 F.3d 1031, 1036 (8th Cir.1994)). An alien is "discovered" when two elements are satisfied: 1) the alien's physical presence in the United States is discovered; and 2) the identity and status of the alien are ascertained. Id. Defendant con-

tends that immigration authorities clearly knew who he was and that his presence in the United States was illegal no later than November 9, 1994, as evidenced by memoranda written by Agent Wardy. The Government argues that the there is no evidence that immigration officials knew beyond a reasonable doubt that the person suspected of being an illegal alien in Agent Wardy's memoranda was, in fact, the Alfredo Sotelo–Salgado who was previously deported in 1993. Thus, the Government contends, Defendant was not truly "discovered" in late 1994 because his identity and status had not been confirmed through the use of fingerprints.

▪ The Court declines to adopt the extreme position advanced by the Government, *i.e.*, that the I.N.S. must have proof beyond a reasonable doubt as to an alien's illegal status before an individual can be considered to have been "found in" the United States. The case law, while admittedly sparse, does not appear to support the imposition of such a high threshold. For example, in *United States v. Acevedo,* a defendant was deemed "found in" the United States when the I.N.S. received the first of three letters from the New York State Department of Correctional Services "notifying the agency of Acevedo's incarceration, informing it of the possibility that Acevedo was an illegal alien, and inquiring whether it would be seeking Acevedo's deportation." *United States v. Acevedo,* 229 F.3d 350 (2d Cir.2000); *see also United States v. Hernandez,* 189 F.3d 785, 790 (9th Cir.1999) (citing District Court holding that "defendant was 'found' as used in 8 U.S.C. § 1326 when the I.N.S. first concluded that he had *likely* violated section 1326.") (emphasis added).

In this case, Agent Wardy had evidence that Defendant presented the Department of Transportation with an expired I–94 form showing his photo, date of birth, and address in Des Moines. Agent Wardy had actual possession of the I–94 form, as well as information from a D.O.T. employee that the individual who had applied for a driver's license was the same individual whose picture appeared on the I–94 form. Agent Wardy compared the photo from the I–94 form with photos from Defendant's I.N.S file and determined that the photos matched. Additionally, Agent Wardy had a videotape showing the Defendant inside the D.O.T. on October 17, 1994. Perhaps the most indicative fact that the I.N.S. knew not only of Defendant's presence, but also of his identity and status, is the fact that Agent Wardy turned the case over to the United States Attorney's Office for prosecution.

In *Gomez,* the Eighth Circuit stated, though arguably in dicta, "we believe that the statute of limitations for a 'found in' violation should also begin running when immigration authorities could have, through the exercise of diligence typical of law enforcement authorities, discovered the violation." *Gomez,* 38 F.3d at 1036. On the facts of this case, the Court is convinced that the I.N.S. knew that Defendant was present illegally in the United States on November 9, 1994, and that it was reasonably certain of defendant's status and identity. Even assuming that the information known to the I.N.S. was somehow insufficient to satisfy the requirements for "discovery," it is clear that through reasonable diligence, the I.N.S. could have taken steps to more accurately confirm the defendant's identity and status. Nonetheless, the record does not reflect further investigative efforts by either the I.N.S. or the United States Attorney's Office. The Court holds that Defendant was "found in" the United States, for purposes of Section 1326 on November 9, 1999, and that the statute of limitations was triggered on that date.

### B. Was the Statute of Limitations Tolled?

 Having found that the statute of limitations began to run on November 9, 1994, the Court must next determine whether the statute of limitations was tolled at any time prior to its natural expiration on November 9, 1999. Title 18, United States Code, Section 3290 provides, "No statute of limitations shall extend to any person fleeing from justice." The Government bears the burden of proving flight from justice by a preponderance of the evidence. *See United States v. Marshall*, 856 F.2d 896, 900 (7th Cir.1988); *United States v. Gonsalves*, 675 F.2d 1050, 1054 (9th Cir.1982).

Here, the Government argues that Defendant concealed his identity from the Government by providing false names to local law enforcement when he was arrested in 1997 and 1999. Such conduct, the Government asserts, "constituted a change in his being easily known and found in an identified and identifiable status," thus tolling the statute of limitations. The Defendant counters that the evidence shows only minimal efforts by authorities to locate him and that such minimal efforts cannot satisfy the Government's burden to prove flight from justice by a preponderance of the evidence.

The Eighth Circuit has addressed the question of what constitutes a flight from justice in only two primary cases. In the first, *King v. United States*, the Court held, "The simple fact that they (persons who have committed crime within a state) are not within the state to answer its criminal process when required renders them, in legal intendment, fugitives from justice." *King v. United States*, 144 F.2d 729, 731 (8th Cir.1944). The Court reaffirmed the holding of *King* in *Matter of Assarsson*, where it stated, "[T]his Circuit follows the absence from the jurisdiction test of fugitive status; intent to avoid arrest or prosecution is not required." *Matter of Assarsson*, 687 F.2d 1157, 1162 (8th Cir.1982); *see also McGowen v. United States*, 105 F.2d 791, 792 (D.C.Cir.1939). Unfortunately, *King* and *Assarsson* offer little, if any, guidance on the issue now before the Court. Indeed, both cases specifically deal with a situation where a defendant committed a crime within a jurisdiction and then was absent from that jurisdiction when called to answer for the crimes. Here, the government offered no evidence that Defendant ever left the jurisdiction.

With the exception of the *King* line of cases holding that mere absence is sufficient to constitute flight, every circuit that has interpreted section 3290 has held that the statute requires some proof of a defendant's intent to flee from justice. *See Ross v. U.S. Marshal for Eastern Dist. of Oklahoma*, 168 F.3d 1190, 1194 (10th Cir. 1999); *United States v. Greever*, 134 F.3d 777, 781 (6th Cir.1998); *United States v. Rivera–Ventura*, 72 F.3d 277, 283 (2d Cir. 1995); *United States v. Fonseca–Machado*, 53 F.3d 1242, 1244 (11th Cir.1995); *Marshall*, 856 F.2d at 900 (7th Cir.); *United States v. Gonsalves*, 675 F.2d at 1052 (9th Cir.); *Donnell v. United States*, 229 F.2d 560, 565 (5th Cir.1956); *Brouse v. United States*, 68 F.2d 294, 295 (1st Cir.1933). Indeed, even the District of Columbia Circuit, which in *McGowen* held that mere absence from a jurisdiction was sufficient to consider a defendant a fugitive from justice, has adopted this position. *See McGowen*, 105 F.2d at 792; *United States v. Singleton*, 702 F.2d 1159 (D.C.Cir.1983).

In *Singleton*, the D.C. Circuit acknowledged its former holdings in *McGowen* and *Green v. United States*, which both involved defendants who had left the District of Columbia. *See Singleton*, 702 F.2d at 1169 n. 32. In those cases, the court held,

"The question is not whether [the defendant] remained out of the District for any particular reason, or at all; it is enough that he did not remain ... within the District." *Id.* (citing *Green v. United States,* 188 F.2d 48, 48 (D.C.Cir.1951)). The court distinguished those cases, however, based on the fact that the Government had not presented any evidence that Singleton had ever left the jurisdiction. *Id.* "It is therefore unnecessary for us to decide whether the rule of law set forth in these early cases—that mere absence from the jurisdiction is sufficient to toll the statute—retains its vitality today." *Id.*

Thus, without overturning the "mere absence" line of cases, the D.C. Circuit adopted the position of the other circuits that have considered the issue:

> We agree that flight from the jurisdiction is not required to trigger the tolling provision. It would be neither logical nor supportive of the policy underlying section 3290 to interpret the law in such a way that one who leaves and is found without the jurisdiction is "fleeing justice" regardless of his intent, while one who actively evades authorities and conceals himself within the jurisdiction can receive the benefit of the statute of limitations.... We do not believe that failure to make a court appearance in itself necessarily renders one a fugitive from justice ... It appears that the Marshal's Service made only minimal efforts to locate Singleton. Therefore, we cannot infer too much from the fact that these efforts proved fruitless. We conclude that on the facts of this case, the Government failed to show that Singleton *acted with the intention of avoiding prosecution.* The motion to dismiss the indictment under section 3150 was properly granted.

*Singleton,* 702 F.2d at 1168–70 (emphasis added).

Accordingly, it appears that the issue of whether Defendant was "fleeing from justice" within the meaning of section 3290, is a matter of first impression in this Court. The force of the Eighth Circuit's holding in *King* has never been raised with respect to a situation where no evidence exists to find that a defendant left the jurisdiction where he committed a crime. In *Matter of Assarsson,* the Circuit Court reiterated *King's* holding that "intent to avoid arrest or prosecution is not required" in the "absence from the jurisdiction test of fugitive status." *Assarsson,* 687 F.2d at 1161. However, the *Assarsson* Court provided an alternative holding, noting that, "even using an intent test, the government showed appellant left Sweden with the intent to avoid arrest or prosecution." *Id.* Indeed, in footnote nine, the *Assarsson* Court left open the door for a requirement of intent in situations where no physical absence from the jurisdiction is presented: "Physical absence from the jurisdiction is not, however, essential to toll the statute of limitations under section 3290. It is enough that an accused leaves his usual place of abode and conceals himself for the purpose of avoiding arrest or prosecution." *Id.* at 1162 n. 9 (citing *United States v. Wazney,* 529 F.2d 1287, 1289 (9th Cir. 1976)); *see also Matter of Extradition of Betrand,* 1986 WL 8845 (D.N.J.1986) (declining to follow *Assarsson* on the basis that it actually addressed a situation where intent was readily found in the facts of the case and expressed in the alternative holding of the court, and holding that the phrase "fleeing from justice" requires something more active than mere absence from the charging jurisdiction).

The United States Supreme Court decision in *Streep v. United States,* supports a finding that intent is generally a necessary element for a finding that a defendant has fled from justice. *See Streep v. United*

*States*, 160 U.S. 128, 16 S.Ct. 244, 40 L.Ed. 365 (1895). While Streep did not squarely address the issue of whether, in broad terms, it is necessary to show the accused's intent to avoid prosecution in order to toll a criminal statute of limitations, it appears that the Court implicitly recognized that some degree of intent is necessary. *See generally id.* Considering the predecessor to section 3290, the former Revised Statute section 1045, the *Streep* Court stated, "In order to constitute a fleeing from justice ... [i]t is sufficient that there is a flight with the intention of avoiding being prosecuted." *Id.* at 133, 16 S.Ct. 244.

■ On the whole, the Court does not believe that the Eighth Circuit rulings in *King* and *Assarsson* govern the outcome of this case because there is no evidence that Defendant ever left Iowa after initially having been "found" here in November 1994. Similarly, in light of the reasoning, *supra*, the Court does not believe that *King* and *Assarsson* prohibit the Court from requiring that the Government show, by a fair preponderance of the evidence, that Defendant somehow secreted himself from authorities with the intent to avoid arrest or prosecution. Indeed, the Court believes that the Government does have such a burden in cases where no evidence of absence from the jurisdiction is presented.

Applying this rule to the facts of the case, the Court does not believe that the Government has carried its burden of showing that Defendant's actions between his initial detection in the Southern District of Iowa and his indictment in January 2002 evidence an attempt to conceal himself with the intent of avoiding arrest. *See United States v. Rivera–Ventura*, 72 F.3d at 277. The only evidence offered by the Government was that, during the time frame between detection and arrest, De-

fendant was twice arrested by Des Moines police and on both occasions, provided a false name to authorities. During the first arrest, on August 18, 1997, Defendant provided authorities with the name Reuben Millan Armenta. On June 14, 1999, Defendant provided law enforcement with the name Fauso Brito. It appears that fingerprints were taken each time, but the I.N.S. alleges it never became aware of Defendant's 1997 and 1999 arrests until after his arrest on December 30, 2001. On that occasion, Defendant was using the name Fausto Millan. A check by local law enforcement with immigration revealed Defendant's true name was Alfredo Sotelo–Salgado. I.N.S. was notified and the present charges resulted. It is unclear from the testimony at hearing whether Defendant's use of a false name hindered, in any way, the I.N.S. from locating him. Indeed, evidence at hearing revealed it was possible that even if Defendant had provided local authorities with his true name, I.N.S. still would not have been aware of his whereabouts or presence in the Southern District of Iowa.

In *Rivera–Ventura*, the Second Circuit held, "[A]n alien who knows he is subject to criminal prosecution and who gives the INS and other law enforcement authorities false names and addresses has engaged in acts of self-concealment that may properly be found to constitute constructive flight within the meaning of § 3290." *Rivera–Ventura*, 72 F.3d at 285. *Rivera–Ventura*, however, involved a case where the defendant provided the I.N.S. with a false address to secure release on bail. *Id.* at 285. After release, the defendant failed to appear for hearings, gave local law enforcement false names and addresses, and failed to inform the I.N.S. of his whereabouts. *Id.* The *Rivera–Ventura* Court found that the district court, as finder of fact, was free to infer that the defendant

was attempting to conceal himself, based at least in part on his knowledge that he could be criminally prosecuted. *Id.*

Nonetheless, the Court finds this case to be more factually similar to *Singleton.* There, the D.C. Circuit refused to find that the defendant was "fleeing from justice" even after defendant failed to appear for court hearings and failed to contact his attorney about his case. *Singleton,* 702 F.2d at 1169. The Court appeared to weigh Defendant's actions against the affirmative steps by law enforcement to apprehend him. The *Singleton* Court determined that the defendant did not act with the intention of avoiding prosecution in light of the fact that he lived at an address known to law enforcement for more than two years and worked at a known job for over eighteen months, but the record revealed no evidence that law enforcement tried to locate the Defendant, to find his new address, or to follow up on leads to his whereabouts. "It appears that the Marshal's Service made only minimal efforts to locate Singleton. Therefore, we cannot infer too much from the fact that these efforts proved fruitless. We conclude that on the facts of this case, the Government failed to show that Singleton acted with the intention of avoiding prosecution." *Id.* at 1170.

Weighing against Defendant's use of false names in this case are several factors. First, evidence at hearing supports a finding that the I.N.S. could have taken Defendant into custody immediately upon the determination by Agent Wardy that probable cause existed to believe that he was an illegal alien. It appears from the record that Agent Wardy elected not to exercise an administrative arrest of Defendant, but rather chose to pursue an indictment for illegal reentry. Second, Agent Wardy's November 15, 1994 memo reflected a current Des Moines address for Defendant.

The address was the same address Defendant lived at prior to being deported in 1993. The only indication that the I.N.S. or the Marshal's service ever attempted to locate Defendant at that address comes from a memo dated September 5, 1995 wherein Agent Wardy notes that the address for Defendant is no longer valid. Indeed, Agent Walsh, who testified at hearing, had no knowledge of whether Agent Wardy, or anyone else, ever went to the address to verify that it was no longer valid. Nor did he know whether anyone checked the phone book, postal service, or any computerized databases to determine the whereabouts of the Defendant. Third, no arrest warrant was ever issued for the defendant. Agent Walsh indicated in his testimony that the ratio of illegal aliens to investigative agents prevented substantial investigation or tracking of any one individual. However, he also indicated that if an indictment and arrest warrant had been returned against the Defendant, more of an effort to locate him would likely have been made.

■ The reason the statute of limitations is inapplicable when an accused flees from justice is because the failure to prosecute in such a case is attributable to the unacceptable conduct of the accused. *See Wazney,* 529 F.2d at 1289. Nonetheless, fairness and the purpose of section 3290 would be undermined if the accused were held responsible for delays which are attributable to the actions, or more accurately, the inaction, of law enforcement. *See id.* at 1289 ("The accused should not be held responsible, however, for unintentional and innocent delays, such, for example, as one caused by an open move to a new residence where the accused is readily accessible to careful law enforcement officers."); *Donnell,* 229 F.2d at 564 ("it would do violence to the reason and purpose of Section 3290 to hold that a person

was 'fleeing from justice' so as to suspend the running of the statute of limitations if he legitimately left the district of the supposed crime or moved his home openly to another district, being all the while easily accessible to any officer who might have a warrant to serve.").

Fundamentally, the Court believes that this situation is one where the Defendant was clearly known to the I.N.S. and to the United States Attorney's Office no later than November 9, 1994. Virtually no attempt was ever made by law enforcement to administratively or criminally arrest, indict, or otherwise bring the Defendant into custody. For reasons having nothing to do with Defendant himself, the Government elected not to pursue the case administratively or criminally. In fact, the record indicates that the Defendant's known address was valid for at least five months after the I.N.S. referred the case for prosecution, if not for longer. Indeed, in over seven years, the best efforts to locate the Defendant are reflected by one line in a memorandum indicating that Defendant's known address was no longer valid. What, if any, follow-up investigation was ever conducted is questionable.

The Court believes that, on the facts of this case, section 3290 should not toll the statute of limitations for two reasons. First, the Court does not believe that the Government has met its burden, to prove by a preponderance of the evidence, that Defendant concealed himself with the intent of avoiding prosecution. The only evidence supporting such a claim is unsubstantiated testimony that on two occasions, one three years, and one five years after Defendant's initial detection, the Defendant gave a false name to law enforcement upon arrest. The Court simply does not believe that this is sufficient to support a finding that Defendant was a fugitive from justice by a preponderance of the evidence. Second, the Court believes that tolling the statute of limitations on these facts would be fundamentally unfair and would defy the purpose of the both the statute of limitations and the tolling statute. Statutes of limitations are statutes of repose "designed principally to protect individuals from having to defend themselves against charges supported by facts that are remote in time," *Rivera–Ventura*, 72 F.3d at 281 (citing *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970)). Accordingly, this Court is guided by the rule that "criminal limitations statutes are to be liberally interpreted in favor of repose." *Gomez*, 38 F.3d at 1037 (citing *United States v. Habig*, 390 U.S. 222, 227, 88 S.Ct. 926, 19 L.Ed.2d 1055 (1968)). This construction would be severely undermined were the Court to allow the Government, who knew of Defendant's crime for over seven years, to do virtually nothing to bring the accused to justice, but then gain the benefit of section 3290 merely because the accused used false names on two known occasions.

### III. CONCLUSION

For the reasons set forth herein, the Court concludes that the statute of limitations in this case was triggered on November 9, 1994. The Court further finds that the statute was not tolled pursuant to 18 U.S.C. Section 3290, and the Indictment is, therefore, barred as untimely. Accordingly, it is the order of the Court that Defendant Sotelo–Salgado's Motion to Dismiss the Indictment (# 17) is GRANTED. The Indictment is hereby DISMISSED.

IT IS SO ORDERED.